UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

KAWANA HOWARD,                              :
                                            :
                          Plaintiff,        :
                                            :        MEMORANDUM & ORDER
            -against-                       :
                                            :        1:17-cv-364 (ENV) (LB)
CONSOLIDATED EDISON COMPANY OF              :
NEW YORK, INC.,                             :
                                            :
                          Defendant.        :

---------------------------------------------------------- x

VITALIANO, D.J.

On January 19, 2017, *pro se* plaintiff Kawana Howard filed this action against defendant

Consolidated Edison Company of New York ("ConEd").  It is brought pursuant to 42 U.S.C.

§ 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights

Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"), alleging that

defendant unlawfully discriminated against her on the basis of race and sex and retaliated against

her for participation in an earlier investigation into sex discrimination at ConEd.  Howard also

claims that defendant violated her rights under the Family and Medical Leave Act ("FMLA") for

discharging her while on medical leave.  Defendant has now moved for summary judgment,

pursuant to Federal Rule of Civil Procedure 56(a).  For the reasons set forth below, ConEd's

motion is granted.

## Background[1]

### A.   *Employment at ConEd*

Howard began her career at ConEd in August of 2002, when she was hired as a Customer

---

[1] The facts are derived from the operative complaint, defendants' Rule 56.1 statement and
plaintiff's Rule 56.1 counterstatement, and the parties' declarations and exhibits. All factual

Field Representative.  Dkt. 63-1 ("Def's SoF") ¶ 1.  By August 2012, Howard had transitioned to work as an Inspector in the Special Projects Group of ConEd's construction organization, a position that she held until her termination in May 2015.  *Id.* ¶ 2, 15.  During the time that Howard worked at ConEd, she was represented by Utility Workers of America Local 1-2, which had a collective bargaining agreement with ConEd that governed the terms and conditions of her employment there.  *Id.* ¶ 3.

In 2007, the New York Attorney General's Office began an investigation into allegations of sex discrimination against female workers at ConEd.  Dkt. 63-11 ("Pl's SoF") ¶ 8.  Starting in 2009, Howard actively participated in the Attorney General's investigation and continued participating over the next several years.  Dkt. 63-10 ("Howard Aff.") ¶ 8.  Howard claims that she "complain[ed] about sex and race-based discrimination" in interviews with the Attorney General's office, and specifically discussed discrimination on the part of Pascale Ambrosio, *id.* ¶¶ 9–10, who became manager of Howard's department on July 1, 2013.  Def's SoF ¶ 4.  The Attorney General's investigation culminated in a lawsuit with a $3.8 million settlement, in which Howard declined to participate.   Howard Aff. ¶¶ 12, 22; Dkt. 14 ("Am. Compl.") ¶¶ 5–6.  Howard claims that her participation in the investigation was widely known to all relevant managers and supervisors at ConEd, in part because she is referred to by name and quoted in the Attorney General's press release and a September 2015 New York Daily News article.  Howard Aff. ¶¶ 12, 18–19, 23–24, Exs. C, D.

---

statements alleged in plaintiff's pleadings are taken as true and all reasonable inferences are drawn in favor of the plaintiff.  *Vietnam Ass'n of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

B.      *Discipline and Termination*

Over the six-year period between 2009 and 2015, Howard was formally reprimanded on five occasions before eventually being terminated from ConEd.

Up first, in June 2009, plaintiff received a verbal warning for her role in an automobile accident that ConEd's accident review committee determined was preventable.  Rattner Decl. Ex. 1.  Howard was again reprimanded in January 2010, when she was given a warning and suspension for calling one of her co-workers "trash" and a "f-cking lying a-s mother f-cker" and then being disruptive in the subsequent interview regarding the incident.  Def's SoF ¶ 5.  The punishment was reduced to a verbal warning as a result of an agreement reached with Howard's union.  Rattner Decl. ¶ 8.

A third disciplinary action was taken against plaintiff in December 2011 in connection with her conduct while working on location on the afternoon of October 18, 2011.  In this episode, ConEd reprimanded her for exceeding her allotted lunch break by more than 45 minutes, travelling off work location without permission by having a contractor drive her for a personal errand, and acting discourteously toward her supervisor when confronted.  Def's SoF ¶ 7; Rattner Decl. Ex. 3.  She was suspended for 10 days as a result of the disciplinary infractions.  *Id.*

ConEd formally disciplined Howard a fourth time in July 2014,  after an incident at ConEd's occupational health center, the details of which remain in dispute.  According to personnel reports submitted by defendant, Howard made "threatening and malicious" comments to staff at the health center and security was eventually called "as a result of her screaming and yelling in the waiting area."  Rattner Decl. Ex. 6. According to plaintiff, she arrived at her appointment to find that the doctor whom she usually saw absent and replaced by two male

3

doctors.  Pl's SoF ¶ 8.  She was told to disrobe so that they could inspect her back injury and she refused, believing that the request "was for a lascivious, non-medical purpose."  *Id.*  Later that day, at the request of her supervisor, Howard returned to the health center, but, contrary to ConEd's account, claims that even though she was shaken and believed that she had been sexually harassed, she "did not yell at or threaten anyone."  *Id.*[2]

This incident led to further punitive action against plaintiff.  ConEd suspended Howard for ten days and issued her an All-Inclusive Final Warning ("AIFW"), which put her on notice that any infractions within a twelve-month period would result in termination.  Def's SoF ¶¶ 8–9.  This sanction was grieved by Howard's union and submitted to arbitration, at which Howard was represented by counsel provided by the union.  *Id.* ¶ 10.  The neutral arbitrator determined that the episode constituted "serious misconduct" on Howard's part and upheld the suspension and final warning.  *Id.* ¶ 11.

The forewarned final strike ending in termination resulted from a series of infractions that occurred between February and March of 2015, the details of which are disputed by the parties.  First, according to ConEd, Howard was unable to account for her whereabouts from work from 12:45 p.m. to 2:00 p.m. on February 4, 2015, and then took an unannounced and unapproved absence from 2 p.m. to 3:30 p.m. that same day.  *Id.* ¶ 14.  Second, ConEd found that Howard was uncooperative during the company's investigation into these absences.  *Id.*  Third and finally, Howard failed to timely submit her February and March mileage sheets.  *Id.*

In her version of what happened, Howard says that she slipped while working on

---

[2] This was not the only skirmish sparked by alleged verbal abuse.  On March 27, 2014, Howard was reprimanded, but not formally disciplined, for using inappropriate and abusive language with a security guard who told her that she could not park her car in a certain location in the ConEd parking area.  Rattner Decl. ¶ 10.

February 3, 2015, injuring her knee and wrist, and claims she notified her supervisor, Carla Primus, of the injury that same day.  Pl's SoF ¶ 14.  The next morning, still feeling severe pain from the fall, Howard came to work but asked the on-duty supervisor, Ricardo Rodriguez, if she could use one hour of vacation time at the end of the day to see her doctor.  *Id.*  Supposedly at his suggestion, Howard asserts that she then called Primus to ask for permission and to remind her to file an incident report for the fall the previous day.  *Id.*[3]  Howard states that she left the ConEd office at 12:45 p.m. to visit a job site, and, after arriving at 1:00 p.m. and completing her assignment, took a 30-minute lunch break and one hour of vacation time to visit the doctor.  *Id.*  In interviews subsequently conducted by ConEd, Howard refused to share details of her doctor visit because she believed that they were confidential and private.  Howard Aff ¶ 79.  With respect to her infraction for taking unexcused vacation time, Howard charges that she was treated differently by ConEd than a white male ConEd employee, Chris DeNoble, who was merely forced to repay defendant for work hours during which he did not work, but was not terminated or suspended for this infraction.  Am. Compl. ¶ 50.  She also contends that the submission of late mileage sheets was the norm at ConEd, and she was unaware of any occasion on which an employee had been disciplined for tardiness.  Howard Aff ¶ 80.

There appears to be no dispute that on March 3, 2015, Howard began an extended period of medical leave to have a planned surgery performed on her left foot that was unrelated to her injury in February.  Howard Aff. ¶ 85.  This leave, she says, was taken pursuant to FMLA.  *Id.*  On May 13, 2015, the day of her termination, Howard was still on leave but had an appointment at ConEd's occupational health center to evaluate whether she was fit to return to work, which

---

[3] According to ConEd, Howard's supervisor called her at 2:29 p.m. to ask her about her condition from the fall and was only then informed that plaintiff had already left work and would be taking vacation time that day.  Rattner Decl. Ex. 8.

the doctor determined she was not.  *Id.* ¶ 86.  According to Howard, she was "heavily sedated and in pain" during this visit when she was confronted by "Ambrosio and two other white management-level employees" as she was getting in the elevator to leave.  *Id.* ¶ 87.  Howard says that she was led to a conference room, where Shelia Bethea, a human resources representative, and Jean Washington, a business representative from her union, were waiting.  Howard recalls how she sensed what might be about to happen.  It prompted her, she says, to leave, seek out and bring back ConEd's ombudsman, to whom she had previously complained about sexual discrimination from Ambrosio.  Am. Compl. ¶¶ 46–47.  Howard was then informed by Ambrosio that she was being terminated for her misconduct while under an AIFW.  Howard Aff. ¶ 88; Def's SoF ¶ 15.

Howard's termination was grieved by her union, and the matter was submitted to a second arbitration, at which Howard was again represented by counsel provided by her union. Def's SoF ¶ 16.  Upholding ConEd's decision to fire Howard, the neutral arbitrator found that Howard had "engaged in two serious acts of misconduct" and evinced a "disturbing lack of accuracy . . . in relating work events."  *Id.* ¶ 17–18.  The arbitrator also rejected Howard's claims that she had been disparately treated or that ConEd's investigation was done in an intimidating or threatening way, noting that Howard had union representation at all interviews.  *Id.*

C.    *Allegations of Discrimination, Harassment, and Retaliation*

Howard's claim that she was discriminated against on the basis of race and sex centers on one of her supervisors, Pascale Ambrosio, who took over as department manager in July 2013. Howard Aff. ¶ 35.  She alleges that Ambrosio disliked her because she "was an African American female working in a role he believed should be reserved for white men like himself." *Id.* ¶ 36.  Howard does not allege that Ambrosio made any "overt references" to her race or sex,

6

but instead that he would scrutinize Howard's "unremarkable behavior through a discriminatory

lens—which he did not apply to white women or white men," including by characterizing

Howard as "angry" and "insubordinate" and subjecting her to "disproportionately harsh

discipline." *Id.* ¶ 37.[4]  Plaintiff claims that in addition to holding animus toward black women

generally, Ambrosio also discriminated against her in retaliation for her participation in the New

York Attorney General's investigation into sexual harassment at ConEd.  Howard Aff. ¶¶ 12,

104; Pl's SoF ¶ 24.  In his deposition and in his sworn declaration submitted in support of

defendants' motion, Ambrosio denies knowing that Howard was involved in the Attorney

General's investigation.  Def's SoF ¶ 24; Dkt. 63-4 ("Ambrosio Decl.") ¶ 6.  Howard disputes

this, inferring that Ambrosio must have known of her involvement because she was one of the

"most vocal" members of the lawsuit stemming from the investigation and that she had been

approached at least one supervisor asking her about her involvement.  Dkt. 63-7 ("Slivinski

Decl.") Ex. I ("Howard Dep.") at 222:25–224:12.[5]  Howard also notes that she was referred to by

name and quoted in the Attorney General's press release and a September 2015 New York Daily

News article.  Howard Aff. ¶¶ 12, 18–19, 23–24, Exs. C, D.  However, Howard testified that she

never actually heard Ambrosio mention the investigation.  *Id.* at 224:17–225:2.  Indeed, where

Howard references facts about the Attorney General's investigation that could have been known,

---

[4] Plaintiff claims that Ambrosio also "targeted the only other black woman in [her] group," Claudine Whitehead, who was senior to Howard but reported to Ambrosio.  Am. Compl. ¶ 12. Whitehead testified that Ambrosio generally "had a disdain for black people."  Howard Aff. Ex. E ("Whitehead Dep.") at 27:5–11; 58:12–21.  Whitehead was promoted to a managerial position at a different facility on January 1, 2015.  Def's SoF ¶ 27; Dkt. 63-5 ("Whitehead Decl.") ¶ 7.

[5] Howard's contention that Ambrosio must have known of the investigation is in some tension with her testimony that she was surprised and defensive when approached by a female supervisor who was aware of her participation and seemed herself interested in becoming a part of the attorney general's investigation and lawsuit.  Howard Dep. at 223:24–224:16.

the only evidence that she proffers, including the press release, does not contradict Ambrosio's denial that he was not aware of Howard's involvement in the investigation.

Aside from her discipline and eventual termination, which Howard claims were the product of Ambrosio's racial animus and ConEd's retaliation against her, plaintiff points to certain behavior from Ambrosio that was, she felt, indicative of his prejudice against her.  First on her list was her perception that Ambrosio would often stare at her "with open hostility, for no reason."  Howard Aff. ¶ 45.  For example, on March 3, 2015, before Howard began her medical leave, she had, as she recalls it, a meeting with Ambrosio at which she insisted that her shop steward be present telephonically.  Am. Compl. ¶ 19.  Howard claims that her insistence prompted Ambrosio to give her "such a malevolent glare" that she "felt genuinely afraid for [her] safety" and nearly called the police.  *Id.* ¶¶ 20–21.  Testimony from Claudine Whitehead corroborates at least that Ambrosio had some level of "dislike" for Howard.  Pl's SoF ¶ 23. Second, Howard claims that Ambrosio "habitually asked [her] manager about [her] whereabouts to check on [her]" even though he did not monitor other employees in the same fashion.  Am. Compl. ¶ 23.  It is not clear upon what facts this contention rests, as Howard identifies no manager by name, but Whitehead, who managed Howard for several years, offered Howard's story no support, affirming that Ambrosio "never had [her] look for plaintiff nor did he ask [her] about her whereabouts."  Whitehead Decl. ¶ 8.

<u>Procedural History</u>

In July 2015, about two months after her termination, Howard filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that ConEd had discriminated against her on the basis of her race and sex and had unlawfully retaliated against her for her participation in the New York Attorney General's investigation.  Slivinski Decl. Ex. C.  On

May 12, 2016, after EEOC had concluded its investigation, it issued Howard a Notice of Right to

Sue at her request.  Slivinsky Decl. Ex. F.  Approximately eight months later, on January 19,

2017, Howard, proceeding *pro se*, filed the original complaint in this action, naming ConEd as

the sole defendant.  Dkt. 1.  On July 7, 2017, plaintiff filed an amended complaint naming both

ConEd and Pascale Ambrosio as defendants.  Dkt. 14.  Plaintiff dismissed Ambrosio as

defendant without prejudice on June 19, 2018.  Dkt. 37.  For several months beginning on March

26, 2018, Howard obtained legal counsel, but that counsel was formally relieved on February 14,

2019, and Howard has conducted the litigation on a *pro se* basis since that time.  Dkt. 51

<u>Legal Standard</u>

A district court must grant summary judgment if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court's responsibility in

assessing the merits of a summary judgment motion is not to try issues of fact, but rather to

"determine whether there *are* issues of fact to be tried."  *Sutera v. Schering Corp.*, 73 F.3d 13, 16

(2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The moving party bears the burden of demonstrating that there is no genuine issue as to any

material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the court

will resolve all ambiguities and draw all permissible factual inferences in favor of the party

opposing the motion.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d

77, 83 (2d Cir. 2004); *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the

issue on which summary judgment is sought, there is any evidence in the record from which a

reasonable inference could be drawn in favor of the opposing party, summary judgment is

improper").  In determining whether a party is entitled to summary judgment, the Court

considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file,

together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147,156 (2d Cir. 2011).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to demonstrate that there is "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Instead, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . [s]ince a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

But, there is a yellow flag. The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. lona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (citing *Gallo*, 22 F.3d at 1224). However, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380 (2007) (quoting *Matsushita*, 475 U.S. at 586-587 (1986)); *Anderson*, 477 U.S. at 252 (noting that "the mere existence of a scintilla of evidence in

10

support of the plaintiff's position" is insufficient to defeat a defendant's summary judgment motion).

Discussion

I.    FMLA Claim

Plaintiff's allegations concerning her FMLA claim are sparse, and it is difficult to ascertain whether she is making out a claim for interference with her FMLA rights, 29 U.S.C. § 2615(a)(1), or whether she is claiming retaliation for exercising them.  *See* 29 U.S.C. § 2615(a)(2) & (b).  Indeed, the amended complaint merely states that she was on medical leave the day she was terminated and that her medical insurance ended within 10 days of her termination.  Am. Compl. ¶¶ 37, 51.  The affirmation that she submitted in connection with ConEd's summary judgement motion provides no additional information in support of this claim. *See* Howard Aff. ¶¶ 88–89.  Perhaps the most elucidating discussion of Howard's FMLA claim comes from her deposition:

> Q.    And in what way do you believe your Family and Medical Leave Act rights were violated?
>
> A.    I was out sick, I was out on medical leave, I was out on FMLA. I was not back to full duty, I was on FMLA.  So you terminated me while I was out sick and I had just had surgery on my foot, so you know I'm losing my benefits and my foot hasn't even healed."
>
> […]
>
> Q.    Is that the complete factual basis for your FMLA claim?
>
> A.    Yeah, terminated because – well, I was terminated while out sick, yes, so they violated my FMLA rights.

Howard Dep. at 226:17-227:16.  In this exchange, Howard seems to clarify that she is not

11

making an FMLA retaliation claim—she is not alleging that she was terminated *because* she took leave under FMLA—but instead that ConEd's decision to terminate her while on leave interfered with her rights under FMLA.[6]

Case law provides a framework to gauge the sufficiency of such interference claims. "To make out a *prima facie* case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements: (1) that she is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA." *Cooper v. New York State Nurses Ass'n*, 847 F. Supp. 2d 437, 447 n.5 (E.D.N.Y. 2012) (citation omitted). The only element in issue is whether Howard was denied benefits to which she was entitled.

The statutory benefits provision of FMLA is precise, providing that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" under qualifying circumstances. 29 U.S.C. § 2612 (a)(1). At the end of that leave, FMLA provides that the employee shall be "restored by the employer to the position of employment held by the employee when the leave commenced" or an equivalent position. 29 U.S.C. § 2614(a)(1). But the fact that Howard was terminated during her leave does not itself constitute a denial of benefits, as FMLA "was not intended to provide employees with a greater right to reinstatement of other benefits than they would have had if they had been continuously employed during the FMLA leave period." *Genovese v. Goodyear Tire & Rubber Co.*, No. CV-04-4505

---

[6] Even if Howard were making an FMLA retaliation claim, it would fail, as Howard has offered no facts to substantiate a retaliation claim other than the mere fact that she was fired while on leave. *See Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("The law is clear that an employee may be terminated while on medical leave, as long as the taking of the FMLA leave was not the cause for the termination.").

SJF AKT, 2007 WL 2746917, at *6 (E.D.N.Y. Sept. 18, 2007); *see also Mathew v. N. Shore - Long Island Jewish Health Sys., Inc.*, No. 11-CV-6022, 2013 WL 5799883, at *10 (E.D.N.Y. Oct. 23, 2013), *aff'd sub nom. Mathew v. N. Shore-Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70 (2d Cir. 2014).

Charging forward, Howard also notes that her medical coverage was terminated soon after she was fired from ConEd.  Howard Aff. ¶ 89; Howard Dep. at 226:17–227:16.  This can be significant, because FMLA provides that "the employer shall maintain coverage under any 'group health plan' . . . for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave."  29 U.S.C. § 2614(c)(1).  But the regulations accompanying FMLA clarify, "[i]f an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off. . . ."  29 C.F.R. § 825.216.  Further, the Second Circuit has explicitly rejected the argument that the right to FMLA leave and its accompanying protections are "vested" as soon as an employee "exercise[s] her FMLA rights prior to her termination, and that these FMLA rights cannot be abridged by virtue of her termination."  *Santos v. Knitgoods Workers' Union, Local 155*, 252 F.3d 175, 179 (2d Cir. 2001).

Again, this is a benefit preservation provision, not a benefit supplementation provision. An employer's "normal policy concerning sick leave after termination" may operate under such circumstances, as FMLA does not augment the rights of an employee who has been fired for reasons unrelated to their FMLA leave.  *Id.*; *see also Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 190–91 (N.D.N.Y. 2014) ("[I]t is well-settled that an employer is not liable for

'interfering' with an employee's leave when the employee would have been terminated regardless of the leave.") (quoting *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011)).  Thus, without any suggestion that Howard's exercise of her FMLA rights was a "negative factor" motivating the firing decision, her FMLA interference claim fails. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006).

II.    Equitable Tolling

A Title VII employment discrimination suit must be filed "within 90 days" of the receipt of a right to sue notice from EEOC.  42 U.S.C. § 2000e-5.  "Failure to bring suit within the 90-day limitation period is fatal to the claim unless subject to equitable tolling."  *Ko v. JP Morgan Chase Bank, N.A.*, 730 F. App'x 62, 63 (2d Cir. 2018).  There is no dispute that Howard was issued a right to sue notice by EEOC on May 12, 2016, which gave her until August 10, 2016 to file a complaint.  Notwithstanding, Howard did not file her complaint until January 19, 2017, more than eight months after receiving the right to sue notice and more than five months after the deadline had elapsed.  With eyes focused on equitable tolling relief, Howard seeks to excuse her late filing by stating that after being terminated by ConEd she "spiraled into a deep depression" and "had regular psychotherapy appointments [with] a friend who is a social worker.  Howard Aff. ¶¶ 93, 95.  As a result of her depression, Howard claims that she was mentally unable to gather the required documents and file a complaint until her period of depression began to abate, she says, around January 2017.  Howard Aff. ¶¶ 96–97.

The fate of Howard's Title VII claims hinges on the existence of a triable issue of fact as to whether her self-described state of depression justifies equitable tolling.

"When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with

reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003), *as amended* (July 29, 2003) (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan,* 288 F.3d 506, 512 (2d Cir.2002)). While mental illness can justify equitable tolling in some cases, "mental illness does not toll a filing deadline *per se*" and instead calls for a "highly case-specific inquiry" as to the bona fides of the excuse. *Bolarinwa v. Williams*, 593 F.3d 226, 231–32 (2d Cir. 2010) (quoting *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002)). Given the nature of the inquiry, as one might imagine, the burden of demonstrating the appropriateness of equitable tolling lies with the plaintiff. *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

That burden is insurmountable in this case, as the amended complaint pleads only self-serving conclusions with no facts regarding Howard's health that might justify equitable tolling and she "has failed to provide any documentation to support the degree of [her] mental impairments during the relevant time period." *Angiulo v. United States*, 867 F. Supp. 2d 990, 1002 (N.D. Ill. 2012). *See Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (Plaintiff's "conclusory and vague claim, without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights, is manifestly insufficient to justify any further inquiry into tolling."). In and of itself, that is enough to short-circuit any further inquiry as to a possible justification for her filing beyond the limitations period.

Nor would an inquiry support her cause. The claim that she was mentally unable to perform the necessary tasks to file the complaint appears to be contradicted by her own deposition testimony, which establishes that Howard held a full-time job at a new company from

September 2016 to November 2016.  Howard Dep. at 46:25–47:10.  At her new job, she would

work as many as seven days (40 to 60 hours) a week.  *Id.* at 47:19–48:10.  Further undercutting

any justification for equitable tolling, she testified that she travelled to Virginia and Louisiana to

train and work for her new employer.  *Id.* at 48:12–48:21.  Put simply and directly, a limitations

period cannot be equitably tolled when the party seeking tolling has spent a substantial portion of

the period travelling and working extensively.  Holding a job no doubt placed demands on her

time and mental energy, but it clearly demonstrates, at the same time, that Howard was capable

of performing the necessary tasks to draft and file a civil action.  *See Davis v. New York City

Transit Auth.*, 73 F. App'x 524, 525 (2d Cir. 2003) (upholding denial of equitable tolling where

plaintiff "testified that he was able to attend a two-month training course, hold several different

jobs, and pursue multiple legal actions during the period of his alleged incapacity").

Bluntly, plaintiff has failed to show that the deterioration of her mental and emotional

well-being that she claims resulted from her termination by ConEd, which the Court will assume

as true for the sake of argument, would justify equitable tolling of the limitations period.

Howard herself established her ability to work during much of the period to be tolled.  There was

no extraordinary impediment hindering her ability to comply with the limitations period, nor is

that genuinely disputed.  As defendant contends, plaintiff's Title VII claim is barred as untimely.

III.     Other Discrimination Claims

A.      *§ 1981 and NYSHRL Claims*

At summary judgement, courts in this Circuit use the *McDonnell Douglas* framework to

assess claims under § 1981 and NYSHRL.  *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491

(2d Cir. 2010).[7]  Following the *McDonnell Douglass* pathway, "once a plaintiff establishes a

_____

[7] Claims under NYCHRL are analyzed separately.  *See Simmons v. Akin Gump Strauss Hauer &*

prima facie case of race discrimination through indirect proof, the defendant bears the burden of producing a race-neutral explanation for its action, after which the plaintiff may challenge that explanation as pretextual." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020).  In order to state a *prima facie* claim for employment discrimination, "plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 492.  Assuming that plaintiff is able to state a *prima facie* case, she raises a presumption of discrimination, "and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).  Should defendants meet this requirement, "they will be entitled to summary judgment . . . unless . . . plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination," or, in other words, that the defendants' proffered nondiscriminatory reason is pretextual.  *Id.*; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).  As the Supreme Court has recently clarified, "[t]o prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp.*, 140 S. Ct. at 1019.

Although "the burden of establishing this prima facie case in employment discrimination cases is 'minimal,'" *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citation omitted)— indeed, the first three components are already established[8]—Howard faces a number

---

*Feld, LLP*, 508 F. App'x 10, 12 (2d Cir. 2013).

[8] ConEd attempts to argue that plaintiff has failed to establish that an adverse employment action was taken because "excessive scrutiny, staring, and assuming wrongdoing do not constitute adverse employment actions" under § 1983.  Def's Mem. at 12–15; *see Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 467–68 (S.D.N.Y. 2013).  Although true,

17

of serious obstacles that are ultimately fatal to her case.  Specifically, Howard has not demonstrated that the circumstances surrounding her termination "giv[e] rise to the inference of discrimination."  *Ruiz*, 609 F.3d at 492.  The reality that Howard has already taken her principal claims to grievance arbitration is, to say the least, a substantial wrinkle.

Plainly, the fact that the issuance of the AIFW and the ultimate decision to terminate Howard were both subject to arbitration pursuant to the collective bargaining agreement with Howard's union casts a large shadow.  "Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive."  *Collins v. New York City Transit Auth.*, 305 F.3d 113, 115 (2d Cir. 2002).  Howard has not claimed "that the arbitration board 'rubber-stamped' the recommendations of [her] supervisors," *id.* at 119, and so the arbitrators' findings as to the propriety of Howard's discipline and termination are to be given weight in determining whether racial or sexual discrimination are the but-for cause of her termination.  *See Knight v. Nassau Cty.*, No. 17-CV-0958 SFJ-SIL, 2020 WL 4207439, at *6 (E.D.N.Y. July 22, 2020) (to prevent an arbitration decision from being accorded weight, plaintiff must adduce "strong evidence" that the arbitration decision "was wrong as a matter of fact ... or that the impartiality of the arbitration proceeding was somehow compromised" (quoting *Collins*, 305 F.3d at 119)).

ConEd somewhat overplays its hand, though, with respect to these arbitration decisions

---

Howard was also terminated, which constitutes an adverse employment action.  The excessive scrutiny, staring, and assuming wrongdoing constitute facts supporting Howard's claim that the adverse employment action, and the events leading up to it, "took place under circumstances giving rise to the inference of discrimination."  *Ruiz*, 609 F.3d at 492.  They are appropriately considered on the motion.

by proclaiming that "the arbitrators held that plaintiff's discipline and termination each were appropriate and not discriminatory." Def's Reply at 6. In fact, Howard and her union did not appear to argue—and the arbitrators made no corresponding finding—that ConEd was discriminating against her on the basis of race or as retaliation for her participation in the Attorney General's investigation.[9] But this does not mean that the arbitrator's determinations are not entitled to probative weight as to ConEd's motives. *See Butler v. Coca-Cola Refreshments USA, Inc.*, No. 12 CIV. 1791 BMC, 2013 WL 3324995, at *9 (E.D.N.Y. July 1, 2013) ("The case law is clear that the failure to raise [employment discrimination] claims in the context of a labor arbitration does not deprive the award of its evidentiary force under *Collins*."); *id* ("Although this decision does not have a preclusive effect on plaintiff's Title VII retaliation claim . . . the arbitrator's decision that plaintiff's termination was based on a legitimate business reason" fits hand in glove with "the inadequacy of her proof of retaliatory motive." (citing *Collins*, 305 F.3d at 119)).

Turning to the actual arbitration awards, the arbitrators found that ConEd had reasonable cause to impose the AIFW and, subsequently, that ConEd had reasonable cause to terminate Howard's employment. Slivinski Decl. Ex. A at 21, Ex. B at 24. In detailed opinions reached after hearing first-hand accounts, the arbitrators found that there was serious misconduct on the part of Howard. With respect to the July 2014 incident at the health center, the arbitration opinion reflects that Howard was shouting in the waiting room, using profanity, and even making

---

[9] In the first arbitration, the arbitrator considered (and rejected) the union's position that Howard was treated disparately from James Bambina, who stood up for her during the incident that occurred at the medical center but received no discipline. Slivinski Decl. Ex. A at 21. This is not a conclusive finding that ConEd acted without a discriminatory motive, but, rather, a more limited finding that her conduct differed from Bambina's such that it was not improper to discipline Howard and not him. Put another way, it effectively eliminates him as a comparator.

physical threats.  *See, e.g.*, Slivinski Decl. Ex. A at 11–12 ("I have the union backing me, and you don't have anyone backing you, and I can meet you outside."); *id.* ("She's lucky I don't throw this chair at her.").  Likewise, the arbitration opinion discussing Howard's conduct from February to March 2015 was clear in its finding that she "did not seek permission to use work time and thus did not have prior approval to do so" and further noted a "disturbing lack of accuracy by [Howard] in relating work events."  Slivinski Decl. Ex. B at 18.

Howard disputes certain arbitral fact findings, found in both arbitrations, such as the language that she used or the timing and substance of her telephone calls.  Yet, this merely attempts to relitigate issues decided at the arbitration, and does nothing to help demonstrate an inference of discrimination on the part of ConEd.  While the arbitration findings are not conclusive findings of fact, they help demonstrate that Howard's termination rested on sound, nondiscriminatory footing and erect a formidable barrier that Howard has been unable to overcome with evidence of her own.  Indeed, aside from her own belief that she received discriminatory treatment, Howard offers little to support an inference of discrimination.  In fact, Howard's allegations almost all center on one of her supervisors, Pascale Ambrosio, and her belief that he disliked black employees at ConEd and herself in particular.  Howard Aff. ¶¶ 36–37.  To be sure, these beliefs about Ambrosio's antipathy were reinforced by the testimony of Claudine Whitehead, who also reported to him.  Am. Compl. ¶ 12.  Whitehead testified that Ambrosio generally "had a disdain for black people," Howard Aff. Ex. E at 27:5–11; 58:12–21, and for Howard in particular.  *Id.* at 26:16–18.  But even fully crediting the beliefs of Howard and Whitehead about Ambrosio's racial animosity, plaintiff still falls short of an inference of discrimination on the part of ConEd in the decision to terminate her.  That is because the record proof fails to sufficiently connect Ambrosio to ConEd's decisions to take disciplinary action

against her.  Indeed, Ambrosio is not even a key player in the episodes leading to plaintiff's termination.  The fact of Ambrosio's unique display of racial animus but non-involvement in the decision to terminate plaintiffs is reinforced by the arbitration opinion upholding termination, which notes that Howard "made a point on several occasions during her testimony to state that Ambrosio had ongoing 'problems' with her," but that "she did not make" such an assertion with respect to the three supervisors who were actually involved in the incidents underlying her termination.  Slivinski Decl. Ex. B at 17.

The same problems of causation haunt Howard's claim that she was retaliated against for her participation in the Attorney General's investigation, which similarly requires her to demonstrate "a causal connection between the protected activity and th[e] adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). Even assuming that Ambrosio was aware of her participation in the investigation, there is simply no evidence connecting her discipline and termination to any retaliatory motivation that this knowledge may have given him.

Taking a different tack, Howard claims she was singled out among similarly situated employees for discipline never meted out against them and attempts to offer comparator evidence.  The Second Circuit has held that a plaintiff plausibly alleges an inference of discrimination if she can prove that another coworker, who is not in his protected class, was similarly situated to herself "in all material respects," but did not suffer from the same adverse employment action.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000); *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  Finding a similarly situated comparator requires a reasonably close resemblance of the facts and circumstances of plaintiff's case to the case of her comparator, including acts of comparable seriousness.  *Graham*, 230 F.3d

at 40.  Further, a plaintiff relying on comparator evidence must show that the two were subjected to the same disciplinary standards, but the comparator went undisciplined for conduct comparable to that of the plaintiff.  *Id.*

To start, Howard generally compares herself to the majority of employees at ConEd, whom she claims regularly turn their mileage sheets in late and are not disciplined.  Howard Aff. ¶ 80.  This contention is supported by testimony from Claudine Whitehead, who recalled that a majority of employees would hand in their mileage sheets late without serious consequences.  Whitehead Dep. Tr. at 41:16–42:5.  Yet, the late mileage sheets were explicitly not relied upon by the arbitrator as a basis for upholding her termination.  Instead, the arbitrator found that more than sufficient other grounds supported cause for her termination, rendering the mileage sheet infractions immaterial.  Slivinski Decl. Ex. B at 22 ("[T]he arbitrator need not address the Company's charge that the Grievant failed to file her daily electronic worksheets for two months.").  Thus, even assuming the mileage sheet infraction was in some way pretextual, it does not follow that it was pretext for a discriminatory motive—that is, that plaintiff would not have been fired "but for" her race.  *Comcast Corp.*, 140 S. Ct. at 1019; *see Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 319 (E.D.N.Y. 2014), *aff'd,* 594 F. App'x 29 (2d Cir. 2015) ("In order to establish but-for causation, Plaintiff would have to prove that his termination would not have occurred in the absence of a retaliatory motive.").  At any rate, the mileage sheet infraction fails to move the needle with respect to her discrimination claims because it does not cast pretextual doubt upon the core reason that she was fired, namely, taking an extended unexcused absence in the middle of a workday and failing to cooperate with the subsequent investigation—all while being on her final warning.

Howard also identifies three individuals as comparators with respect to her claims.[10]   The first is Michael Garick, whom she claims "had put his hands on a female employee by grabbing her and leaving his hand print on her arm."  Am Compl. at 35.  For this act of violence, he apparently received a two-week suspension and "losing his direct reports" because the matter was "settled in house."  *Id.*  The amended complaint alleges further that Joseph Buscca engaged in similar conduct, and that both he and Garick "assaulted coworkers on the job," but were not suspended or reprimanded."  Am. Compl. ¶ 15.  The third comparator is Chris Denoble, whom Howard claims "stole company time by putting in for overtime he claimed to have worked, while he was home." Dkt. 14 at 36.  Howard claims that while she was discharged for a similar offense, Denoble was merely asked to pay the money back.  *Id.*

The fundamental problem with the allegations concerning each of Howard's comparators is that they remain unsupported by any admissible evidence.  While these allegations might permit Howard's claims to survive at the pleading stage, at summary judgment the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted).  From the record, it does not appear that Howard has any persuasive—much less admissible —evidence supporting her comparator allegations.  Indeed, Howard directly admitted as much with respect to her allegations concerning Chris Denoble.  *See* Slivinsky Decl. Ex. I at 199:6–22 ("What evidence do I have? I don't have any right now, but I can get evidence. . . .").  Further, Howard's own

---

[10] ConEd contends that these comparators are irrelevant because they are not shown to have reported to Pascale Ambrosio, but seems to forget that Howard's claims are against ConEd, not Ambrosio.  Howard claims that ConEd terminated her for discriminatory reasons, and the disparate treatment of other employees is relevant to that determination, regardless of whether they had the same direct supervisor.

testimony concerning the conduct of all three comparators—both at her own deposition and

occasionally at the depositions she took—is clearly hearsay based on office rumors. *E.g., id.* at

199:23–200:17 ("I was in Brooklyn a lot, 30 Flatbush, and that's where I reported to, that was,

like, my headquarters, I worked there and how do I know? People have told me."); *see*

*Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (statements constituting

inadmissible hearsay are an insufficient basis for opposing summary judgment).  Unsupported by

admissible evidence, her proffered comparisons fail on this ground alone.

But, even if Howard had proffered admissible evidence of her comparators' misconduct,

she has not shown that she "was similarly situated in all material respects to the individuals with

whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.

2000).  Critically, Howard has not alleged that any of these individuals had a comparable

disciplinary record to her own, much less that they were subject to an AIFW providing for

termination for "any future infractions."  Rattner Decl. Ex. 6.  This creates asymmetry between

the "disciplinary standards" that applied to each. *Graham*, 230 F.3d at 42.  It is thus unclear how

Michael Garick, Joseph Buscca, or Chris Denoble would have been disciplined for conduct

comparable to Howard's if they had her disciplinary record.  *See Cantres v. N.Y.P. Holdings,*

*Inc.*, No. 14-CV-7257 WFK-RER, 2016 WL 5867046, at *5 (E.D.N.Y. Sept. 30, 2016)

(distinguishing comparators where plaintiff's disciplinary record was "significantly longer").

Put another way, even though Howard's allegations concerning her comparators—unsupported

by any competent evidence—suggest failures on the part of ConEd to discipline certain

employees for misconduct, "defendant's treatment of those employees ha[s] no logical relevance

to [] plaintiff's claims." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also*

*Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), ("[T]he purpose of the

similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.") *aff'd,* 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008).

The shortfall in the proof Howard was required to produce to stave off summary judgment is entirely consistent with the two arbitration decisions finding her guilty of serious misconduct warranting termination.  Consequently, the two arbitration decisions buttress the conclusion that her claims under § 1981 and NYSHRL must be dismissed.

B.     *NYCHRL Claim*

The determination of claims under § 1981 and NYSHRL does not, perforce, determine pendant NYSCHRL claims.  *See Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 109 (2d Cir. 2013).[11]  Rather than engage in entirely separate analysis of analytically distinct state law claims, a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  As the Second Circuit has repeatedly observed, echoing the Supreme Court, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will

---

[11] NYCHRL has a more protective standard than Title VII and NYSHRL.  As a result, although not particularly enlightening, the New York Court of Appeals held that NYCHRL must be construed "broadly" and "in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 477-78, 922 N.Y.S.2d 244, 947 N.E.2d, 135 (2011).  Under NYCHRL's more liberal construction, a plaintiff need not show a connection between the employer's discriminatory conduct and the materially adverse employment action, but merely that she received differential treatment of any degree based on a discriminatory motive.  *Gorokhovsky v. N.Y. City Hous. Auth.*, 552 F.App'x 100, 102 (2d Cir. 2014).

point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

In a procedurally indistinguishable case, *Dhar v. New York City Department of Transportation*, the Second Circuit upheld the district court's decision to decline to exercise supplemental jurisdiction over the plaintiff's NYCHRL claim after granting the defendants summary judgment on all other employment discrimination claims. 630 F. App'x 14, 16 (2d Cir. 2015) (summary order). Following this precedent, the Court declines to exercise supplemental jurisdiction over Howard's NYCHRL claim, thus avoiding needlessly deciding issues of state law and securing for the parties "a surer-footed reading of applicable law" as available in the state courts of New York. *Valencia*, 316 F.3d at 305. Accordingly, plaintiff's claims under NYCHRL are dismissed without prejudice.

Conclusion

For the reasons set forth above, summary judgment is granted in favor of defendant on all outstanding federal and state-law claims, except for plaintiff's claims under NYCHRL, which are dismissed without prejudice to their re-pleading in a state court of appropriate jurisdiction.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
        January 15, 2020

                                        */s/ Eric N. Vitaliano*
                                        ERIC N. VITALIANO
                                        United States District Judge